Filed 11/9/15  P. v. Akin CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B258495 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA128324) |
| v. | |
| EDWIN AKIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert J. Higa, Judge.  Affirmed.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, William H. Shin and Nathan Guttman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant, Edwin Akin, was charged with assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b);[1] counts 1-3) and felon in possession of a firearm (§ 29800, subd. (a)(1); count 4). It was alleged that defendant personally used a firearm with respect to counts 1 through 3 (§ 12022.5, subds. (a), (d)), and, for all counts, it was alleged that he acted for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subds. (b)(1)(A), (B)). It was further alleged that defendant suffered a prior serious felony conviction (§§ 667, subds. (a)(1), (b)-(i); 1170; 1170.12, subds. (a-d)) and served prior prison terms (§ 667.5, subds. (a), (b)).

In a first jury trial, the jury deadlocked on all counts, and the trial court declared a mistrial. On retrial, the jury found defendant guilty on count 4. The jury deadlocked on counts 1 through 3, however, and the trial court declared a mistrial on those remaining counts. In a bifurcated trial on special allegations, the jury found true, with respect to count 4, the prior serious felony conviction, the prior prison terms, and the gang allegations.

The prosecution dismissed counts 1 through 3. The trial court sentenced defendant to a total of 17 years in state prison, consisting of: the upper term of three years, doubled to six years for the prior strike (§ 1170.12, subd. (c)(1)); five years pursuant to section 667, subdivision (a)(1); two years pursuant to section 667.5, subdivision (b); and four years pursuant to section 186.22, subdivision (b)(1)(A).

On appeal, defendant contends that the gang enhancement findings were not supported by substantial evidence. We affirm.

## FACTS

### Prosecution evidence at trial

On January 12, 2013, at approximately 8:30 p.m., Patricia Aguilar was driving on Bexley Drive in Whittier, approaching the intersection with Danby Avenue. Patricia's daughter, Natalie, sat in the back seat, and Natalie's boyfriend, Andrew, was in the front

---

[1]    All further statutory references are to the Penal Code unless stated otherwise.

passenger seat. After turning left onto Danby, Patricia stopped her car because a white Astro van was parked in the middle of Danby, facing away from Patricia's car.

A man stood near the van's open driver's door. He wore baggy pants and a hooded sweatshirt with the hood on, covering a dark "beanie" that he wore on his head. The man was light-skinned and clean-shaven.

Patricia's car was stopped about 15 feet from the back of the van. The man turned to look at the car. He walked quickly toward the car, raised his arms, and pointed a silver-colored gun at the car. He appeared to be angry and was shouting something, but the car's windows were up and the radio was on, so his words were not audible. Andrew yelled, "Go, go, go," and Patricia slammed on the gas pedal and passed the right side of the van.

Patricia drove to a nearby residence, close to the intersection of Pioneer Boulevard and Bradhurst Street. Andrew called 911. Los Angeles County Sheriff's Detective Eric Callahan and Deputies Vicente Gallardo and Ariel Castro arrived at the residence. Deputy Gallardo interviewed Patricia, Andrew, and Natalie about the incident. While he was speaking with Andrew, Natalie interrupted and said, "That looks like the van right there."

Deputy Gallardo turned and saw a white van traveling west on Bradhurst toward Pioneer. The van immediately stopped, and then started driving in reverse. The deputies got in their cars, activated the overhead lights, and pursued the van. The van continued to travel in reverse down Bradhurst, eventually coming to a stop about halfway down the block, near a curve in the road.

Defendant was driving the van. Both the driver's and the passenger's windows were rolled down. Detective Callahan drew his weapon and ordered defendant to show his hands, but defendant did not obey the order. Deputy Castro made his way to the passenger side of the van and opened the passenger door. At the same time, Detective Callahan reached in through the driver's window, grabbed defendant's hand, and pulled him out of the window.

Defendant was handcuffed and searched.  He wore a beanie and a black, hooded sweatshirt.  The van was registered in defendant's name.  The deputies searched the van, but were unable to find a gun.

Defendant was placed standing in the street, and illuminated with the spotlight from a patrol vehicle.  Andrew identified defendant as the gunman.  Patricia did not recognize defendant.  Natalie, although initially unsure, identified defendant as the gunman after the beanie was placed on his head.  All three witnesses recognized the van.  In court, both Andrew and Natalie identified defendant as the man who pointed the gun at Patricia's car.

The deputies searched the ground along Bradhurst near defendant's van and found a gun close to some bushes and an electrical box, about five feet from the curb, on the passenger side of the stopped van.  The gun was a semiautomatic and had a chrome slide and trigger guard.  There were bullets in the magazine and the chamber.  Patricia, Andrew, and Natalie were shown the gun, and all thought it looked like the one they had seen the gunman holding.

During later gun testing, the gun could not be fired because its firing pin was broken.  The firing pin on the type of gun used by defendant commonly breaks, and could easily break from being tossed on the ground.

**Defense evidence at trial**

Tina Espinoza, a friend of defendant's, testified that she had been in defendant's van before January 12, 2013.  According to Espinoza, the passenger window was broken and could not be rolled down.

After defendant was arrested, he made a phone call from jail to a man nicknamed "Little Willie."  Little Willie made arrangements to bail defendant out of jail, and Espinoza participated in these arrangements.  Defendant gave Espinoza his van in exchange for her contribution to his bail.  After acquiring the van, Espinoza tried to fix the passenger window by disassembling the passenger door, but the electrical motor powering the window was broken.

4

**Prosecution evidence on special allegations**

Deputy Steven Lopez testified as a gang expert. According to Deputy Lopez, the territory of the Quiet Village gang included the intersections of Bexley and Danby, as well as Pioneer and Bradhurst. Quiet Village had approximately 115 to 120 documented members and 15 to 20 active members.

One of the ways in which Quiet Village members control their territory is to run up to vehicles passing through the territory and shout out their gang membership, sometimes while armed, "to instill fear in the community and let them know this is our territory you're living in, or you're coming through our gang's territory." This fear makes people less likely to report crimes taking place in Quiet Village territory, allowing gang members to commit more crimes. Through theft, extortion, robbery, and drug sales, the gang makes money it uses to buy guns and expand the gang's criminal enterprise. The gang's primary activities are vandalism, robbery, assault, assault with a deadly weapon, vehicle theft, grand theft, witness intimidation, drug sales and trafficking, firearm possession, and murder.

Deputy Lopez opined that, on January 12, 2013, defendant was an active Quiet Village gang member who went by the moniker Wolf or Wolfie. Defendant had a tattoo on the front of his neck and his chin of the letters "QV," which was short for Quiet Village. He also had gang tattoos on the back of his neck and across his chest. According to Deputy Lopez, the tattoo on the front of defendant's neck would be visible at almost all times, and would be used to promote the gang. Defendant had to earn the right to get the gang tattoos by "putting in work," meaning committing a violent or serious crime.

Deputy Lopez further testified that the spot at which defendant stopped the van when fleeing was directly in front of a safe house and known hangout for Quiet Village gang members, where members stored firearms and narcotics, and where members have previously hidden after running from police. A high-ranking member of the Quiet Village gang, who goes by the name Big Willie, was associated with that house. Big Willie is the father of Little Willie.

5

When presented with a hypothetical based on the facts of the case, Deputy Lopez opined that defendant pointed the gun at Patricia's car for the benefit of the gang, in order to cause fear within the community. Asked to exclude the act of pointing the gun from the hypothetical, Deputy Lopez testified that the act of possessing the gun was for the benefit of the gang because gang members possess firearms to commit crimes and to instill fear. Possession of the gun also benefited the gang by protecting gang territory from a rival gang, Jim Town, with whom Quiet Village was feuding in January 2013. Deputy Lopez further testified, based on similar hypothetical questions, that defendant acted with the intent of promoting, furthering, or assisting criminal conduct by the Quiet Village gang.

In response to further hypothetical questions, Deputy Lopez elaborated on defendant's relationship with Quiet Village gang members: "The phone call, location where he chose to stop his vehicle, it shows to me his association with Big Willie and Little Willie, and that location which I previously referred to as a stronghold for the Quiet Village gang." According to Deputy Lopez, if defendant was not an active gang member and "putting in work," Little Willie would not attempt to bail him out of jail.

**Defense evidence on special allegations**

Gregorio Estevane testified as a gang expert for the defense. He opined that the facts did not support a conclusion that defendant's actions were gang related. He also testified that there was no evidence that defendant continued to be an active gang member.

## DISCUSSION

Defendant contends that the criminal street gang enhancement was improperly imposed because there was a lack of evidence that he possessed the gun for the benefit of the Quiet Village gang, or that he specifically intended to promote, further, or assist criminal conduct by gang members.

Section 186.22, subdivision (b)(1) provides for a sentence enhancement when the defendant is convicted of a felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or

6

assist in any criminal conduct by gang members . . . ." The enhancement requires "both that the felony be gang related and that the defendant act with a specific intent to promote, further, or assist the gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1139.)

We review a section 186.22 gang enhancement finding for substantial evidence. (*People v. Ortiz* (1997) 57 Cal.App.4th 480, 484.) "In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]"' [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054; see also *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1329, *People v. Ochoa* (2009) 179 Cal.App.4th 650, 657 [applying substantial evidence test to contentions that gang enhancements were unsupported by the evidence].)

**I. Substantial evidence supports the conclusion that defendant's crime was committed for the benefit of a criminal street gang**

Section 186.22, subdivision (b)(1) does not apply when a crime is committed only for personal reasons; rather, the crime must be "gang related." (*People v. Gardeley* (1996) 14 Cal.4th 605, 622.)

Generally, where a gang enhancement is alleged, expert testimony concerning the culture, habits, and psychology of gangs—including the motivation for an individual member's actions—is permissible, and a jury may rely on such testimony in making a finding on a gang allegation. (*People v. Ward* (2005) 36 Cal.4th 186, 210; *People v. Gardeley*, *supra*, 14 Cal.4th 605, 617.) However, a finding that an offense is subject to section 186.22, subdivision (b)(1) cannot be based on a gang expert's testimony alone. (*People v. Ochoa*, *supra*, 179 Cal.App.4th 650, 657.) "[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in association with a criminal street gang." (*People v. Martinez* (2004) 116 Cal.App.4th 753, 762.)

Defendant argues that there was no evidence that his crime was committed for the benefit of the Quiet Village gang, and that Deputy Lopez's opinion to the contrary was based on mere conjecture. Deputy Lopez referenced defendant's gang tattoos when testifying how defendant's crime would benefit the Quiet Village gang because it instilled fear in the community. As defendant points out, however, neither Patricia, Natalie, nor Andrew testified that they saw defendant's tattoos, that they heard what he shouted when he approached the car, or that they knew that he was a gang member. According to defendant, no other evidence supported the allegation that defendant's crime was gang related.

The evidence, though, supported the conclusion that defendant was an active member of the Quiet Village gang. Defendant had Quiet Village tattoos and parked his van in the middle of the street in Quiet Village territory. Furthermore, defendant attempted to dispose of his weapon near a Quiet Village gang safe house, where gang members were known to store guns. After encountering the police, defendant drove in reverse halfway down Bradhurst, where he finally stopped directly in front of the house associated with Big Willie. The testimony of Deputies Gallardo and Lopez, when considered in tandem, demonstrates that the gun was found by bushes and an electrical box, which either abutted or were on the property associated with Big Willie. Moreover,

8

Little Willie, the son of Big Willie, bailed defendant out of jail, and Deputy Lopez testified that Little Willie would not have done so if defendant was not an active gang member "putting in work."

Defendant does not dispute that the crime occurred in Quiet Village territory. The evidence presented at trial, coupled with Deputy Lopez's testimony, was sufficient to support a finding that defendant's crime was committed for the benefit of the gang. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1048 ["'Expert opinion that particular criminal conduct benefited a gang'" is not only permissible but can be sufficient to support the section 186.22, subdivision (b)(1) gang enhancement]; *People v. Albillar* (2010) 51 Cal.4th 47, 63.)

Deputy Lopez testified about how Quiet Village gang members would "stand posted" and patrol their territory in order to control the area. He also testified that they would run up to vehicles passing through the territory and utilize firearms "to instill fear in the community." Moreover, Deputy Lopez testified how, at the time of the crime, Quiet Village was feuding with the Jim Town gang. The jury, therefore, could reasonably conclude that defendant possessed a gun within Quiet Village territory in order to benefit the gang by protecting its territory from rival gangs, particularly from the Jim Town gang. The jury could also reasonably determine that defendant's act of running up to Patricia's car and pointing the gun at the car was consistent with the gang's goal of protecting its territory.[2] Thus, the record contains substantial evidentiary support—beyond the mere fact that defendant was a Quiet Village gang member—for the conclusion that defendant's crime was committed for the benefit of the gang.

---

[2]    Although the jury did not convict defendant of assault with a semiautomatic firearm, the record reveals that the most likely reason for the deadlock on these charges was the fact that the gun's firing pin was broken when retrieved by the deputies. The jury posed three questions to the trial court, all of which asked whether defendant could have the "present ability" and/or "physical means" to commit assault if the gun was not operable. There is no reason to assume that the jury did not believe that defendant pointed the gun at the car.

## II. The finding that defendant possessed specific intent was proper

Defendant argues that Deputy Lopez's testimony relating to the second prong of the gang enhancement—that defendant committed the crime with the specific intent to promote, further, or assist in any criminal conduct by gang members—was deficient because it was based on only two facts: that defendant had Quiet Village tattoos and that he possessed a gun in Quiet Village gang territory.

"The enhancement set forth in section 186.22(b)(1) does not pose a risk of conviction for mere nominal or passive involvement with a gang. . . . Rather, it applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (*People v. Albillar*, *supra*, 51 Cal. 4th 47, 67-68.) "Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.)

Defendant contends that this matter is similar to *People v. Rios* (2013) 222 Cal.App.4th 542 (*Rios*). In *Rios*, the defendant, a gang member, was found driving a stolen car, and a loaded gun was found under the passenger seat. At trial, a gang expert testified that the defendant's possession of a gun and a stolen car would promote, further, or assist conduct by gang members because it would enable the gang to commit further crimes. (*Id.* at pp. 573-574.) The appellate court found this evidence insufficient to support a finding of specific intent, noting that the gun possessed by the defendant was not used to intimidate anyone in the community, there was no evidence that a victim knew defendant was acting with a gang purpose, the defendant was not in his own gang territory or that of a rival gang, the defendant did not display his gang affiliation, and the victims of the car theft were not rival gang members. (*Ibid.*)

Defendant also relies on *In re Daniel C.* (2011) 195 Cal.App.4th 1350. In that case, the minor, a gang affiliate, entered a supermarket with two companions, and, after the companions left the store, the minor took a bottle of liquor and tried to leave without paying for it. When confronted, the minor broke the bottle and hit a store employee with it, and then fled with his companions. (*Id.* at pp. 1353-1354.) In finding the evidence

insufficient to support a gang enhancement, the appellate court concluded there was no evidence the minor and his companions planned to commit a violent crime, and there was no evidence that the minor or his companions identified themselves in the store as gang members. Instead, it appeared from the evidence that the minor simply intended to walk away from the market with the bottle of liquor, and the assault was only a matter of happenstance. (*Id.* at p. 1363.) Given these facts, an expert opinion that the minor executed the crime to enhance the gang's respect in the community or to instill fear was "was factually incorrect." (*Id.* at pp. 1363-1364.)

*In re Frank S.* (2006) 141 Cal.App.4th 1192, another case cited by defendant, also dealt with a lack of evidence supporting a gang enhancement. The minor, who was stopped by police after running a red light on his bicycle, was found to be in possession of a concealed knife, a bindle of methamphetamine, and a red bandana. An expert testified that the minor's possession of the knife benefited gang members because "'it helps provide them protection should they be assaulted by rival gang members.'" (*Id.* at p. 1199.) The appellate court reversed the true finding on the gang enhancement, finding that no evidence was presented supporting the enhancement other than the expert's opinion on gangs in general and her conclusion that the crime was committed for the benefit of a gang. (*Ibid.*) The court observed: "The prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense." (*Ibid.*)

Each of these cases is distinguishable. Most obviously here, defendant's crime was committed in gang territory. Although this evidence by itself would not be enough to demonstrate specific intent (see *People v. Ramon* (2009) 175 Cal.App.4th 843, 853), when considered in combination with the other evidence presented at trial, it provided a firm basis for the jury's finding.

*Rios* found that a "lone actor may be subject to the gang enhancement." (222 Cal.App.4th 542, 572.) Thus, the lack of direct involvement in defendant's crime by other gang members did not show that the crime was not gang related. Furthermore, in contrast to *Rios*, where "there was no evidence that the gun defendant transported was

11

brandished or shown to anyone or used to intimidate persons in the community" (*id.* at p. 573), in this case there was ample evidence that defendant threatened those in Patricia's car while in gang territory. And, as explained above, Deputy Lopez testified that Quiet Village gang members patrolled their territory and used firearms to intimidate those entering it. Thus, the jury could properly conclude that defendant possessed the handgun with the specific intent to promote, further, or assist in fellow gang members' criminal conduct—that is, by maintaining control of the area so as to allow fellow gang members to further their criminal enterprise within the territory.

The evidence that defendant attempted to dispose of his weapon near a Quiet Village gang safe house provides further support for this conclusion. In *People v. Margarejo* (2008) 162 Cal.App.4th 102, the defendant attempted to leave a gun with a fellow gang member, which "connect[ed] the gun and the gang," and allowed the jury to infer that the defendant's goal "was to preserve the gun for the gang's future use." (*Id.* at p. 111.) Here, defendant's act of eluding the police by driving in reverse halfway down the block, stopping in front of a gang safe house, and then throwing the gun in the direction of the house, likewise allowed the jury to infer that defendant intended to assist gang members by preserving the gun for their use.

Thus, substantial evidence supports the conclusion that defendant acted with the requisite specific intent.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


                                        BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

12